IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

DENNIS P. MURPHY, as Personal
Representative of the ESTATE OF
WILLIAM D. CRUMPTON, deceased,

      Plaintiff,

vs.                                                  Civ. No. 07-188 JP/WDS

LAURA KAY, M.D., individually and in
her official capacity; LOGAN ROOTS, M.D.,
individually and in his official capacity; and
THE BOARD OF COUNTY COMMISSIONERS
OF SANTA FE COUNTY,

      Defendants.

MEMORANDUM OPINION AND ORDER

On June 27, 2008, Defendant Dr. Logan Roots[1] filed Defendant Logan Roots, M.D.'s Motion for Partial Summary Judgment (Doc. No. 72). Having reviewed the briefs and relevant law, the Court concludes that Defendant Logan Roots, M.D.'s Motion for Partial Summary Judgment should be granted in that Plaintiff's 42 U.S.C. §1983 Eighth Amendment claim against Dr. Roots, in his official and individual capacities, should be dismissed with prejudice based on qualified immunity. In addition, the Court will deny at this time Dr. Roots' request for attorney's fees and costs.

*A. Background*

Plaintiff, the personal representative of the estate of William Crumpton, contends that Defendants are responsible for failing to give Coumadin, a blood thinner, to Mr. Crumpton while

---

[1]The First Amended Complaint for Damages for Deprivation of Civil Rights, Wrongful Death and Common Law Torts (Doc. No. 10-3)(First Amended Complaint), filed February 21, 2007 incorrectly refers to Dr. Roots as Dr. "Root."

he was incarcerated at the Santa Fe County Adult Detention Facility (SFCADF) from March 21, 2006 to April 25, 2006.  Plaintiff alleges that the failure to give Coumadin to Mr. Crumpton led to his death two days after he was released from SFCADF.

    *1. The Facts*

Mr. Crumpton was first incarcerated at SFCADF in 2004.  Although the staff at SFCADF had assured Joanne Crumpton, Mr. Crumpton's wife, that he would get his medications while incarcerated, the staff did not initially provide Mr. Crumpton with his medications including Coumadin. Consequently, Mrs. Crumpton wrote a letter to the New Mexican, a Santa Fe newspaper, about her inability to persuade the staff at SFCADF to give Mr. Crumpton his medications.  As a result of that letter, Mr. Crumpton received his medications at SFCADF.  Mr. Crumpton was later released from SFCADF apparently sometime in 2004.  Medical records from the Veterans Administration (VA) show that Mr. Crumpton had his blood tested and his Coumadin dosage adjusted multiple times from October 2004 to March 6, 2006 at the VA Coumadin Clinic.

On March 21, 2006, Mr. Crumpton was again incarcerated at SFCADF.  Upon being incarcerated, Mr. Crumpton was seen by Patrick Dan Salas, the Paramedic/Laboratory Supervisor and Medical Supply Supervisor at SFCADF, who completed a Medical Intake History and Screening form.  Mr. Salas noted on the Medical Intake History and Screening form that Mr. Crumpton did not indicate that he had a medical problem that needed immediate attention.  Mr. Salas, however, noted that Mr. Crumpton had seen a doctor in the last 6 months concerning Coumadin use.  In answering a question regarding chronic illness, Mr. Salas did not indicate on the Medical Intake History and Screening form that Mr. Crumpton had a problem with blood coagulation. Although Mr. Salas listed Mr. Crumpton's medications, including exact

dosages, he did not list Coumadin.  Mr. Salas testified that it was unique that an individual in Mr. Crumpton's position was so familiar with his medications and that if Coumadin was not listed as a medication, it was because Mr. Crumpton did not tell Mr. Salas that he was currently taking Coumadin.  The Medical Intake History and Screening form showed that Mr. Crumpton's doctors were Dr. Drummer and Dr. Gonzales at the VA, and that Mr. Crumpton used the Kiva Pharmacy. The Medical Intake History and Screening form also noted that Mr. Crumpton had been incarcerated previously but the form did not indicate a time or place for that previous incarceration.  Having completed this initial medical assessment, Mr. Salas cleared Mr. Crumpton to join the general inmate population.  Subsequent to Mr. Crumpton's examination by Mr. Salas, SFCADF confirmed Mr. Crumpton's prescriptions for all of his listed medications.  The confirmed prescriptions did not include Coumadin.

Next, Mr. Crumpton saw Dr. Roots on March 28, 2006.  Dr. Roots was unaware that Mr. Crumpton had been incarcerated previously despite the indication in the Medical Intake History and Screening form of a previous incarceration.  Consequently, Dr. Roots did not request Mr. Crumpton's 2004 SFCADF medical records.

According to Dr. Roots, Mr. Crumpton stated that he had a blood clot in his leg in 1999 and had been taking Coumadin since then but that he did not know the dosage of the Coumadin.  Dr. Roots, however, did not believe Mr. Crumpton regarding his Coumadin use because Mr. Crumpton stated that he had been "very lax" in 2006 about taking Coumadin, and Coumadin was not a listed medication on the Medical Intake History and Screening form.  Depo. of Logan Roots at 28, Ex. 9 (attached to Exhibits 7-28 to Responses to Motion for Summary Judgment (Doc. No. 80), filed July 25, 2008 (Plaintiff's Exhibits II)). Dr. Roots also contended that Mr. Crumpton did not ask for Coumadin and "[h]e didn't seem to care...." *Id*. at 30.

Dr. Roots' medical notes state that except for being overweight, Mr. Crumpton was "otherwise well." Dr. Roots also noted in the medical record that Mr. Crumpton had hypertension which was well controlled, suffered from diabetes, and was taking lithium for a bipolar condition. Moreover, Dr. Roots noted that although Mr. Crumpton had a history of blood clots in the calves, that there was "[n]o need for coumadin now." Ex. 8 (attached to Plaintiff's Exhibits II).

In order to decide whether Mr. Crumpton should start taking Coumadin again, Dr. Roots ordered an international normalized ratio (INR) blood test to establish a baseline value for determining how well Mr. Crumpton's blood was coagulating.[2] The desired INR therapeutic value for a patient on Coumadin is between 2 and 3. A value between 1 and 2 is considered normal but not therapeutic. Dr. Roots testified that if the INR results had been above 3, he would not have started Mr. Crumpton on Coumadin because of the possibility of excessive bleeding. If the results had been normal, Dr. Roots would have waited to review Mr. Crumpton's VA medical records, and Dr. Laura Kay, the medical director at SFCADF, would have had to decide whether to start Mr. Crumpton on Coumadin. Dr. Roots testified that Coumadin is usually prescribed on a lifetime basis and that a dose of Coumadin is effective for only a day or two.

In fact, the INR test Dr. Roots ordered was never done and Dr. Roots never personally contacted Mr. Crumpton's doctors nor did he request any VA medical records.[3] The day after Dr. Roots saw Mr. Crumpton, Dr. Roots went on vacation. Both Lynn Cordahi, a nurse practitioner,

---

[2] Other blood tests ordered with the INR test were prothrombin time (PT) and partial thromboplastin time (PTT) tests.

[3] Dr. Roots testified that nurses request the medical records by fax.

4

and Dr. Kay would have been expected to take on Dr. Roots' duties while he was on vacation. Dr. Roots claims that he did not discuss Mr. Crumpton's case with Ms. Cordahi before he left on vacation.[4]

On April 6, 2006, Ms. Cordahi saw Mr. Crumpton. Ms. Cordahi noted on an Admission Data form that Mr. Crumpton had a blood clot six years previously and that his current medications included Coumadin. She also noted on a Medical History and Physical Assessment form the precise dosage of Coumadin which Mr. Crumpton stated he had been taking. Ms. Cordahi, moreover, completed a Problem List form which indicated a leg clot going to the lungs in 1999 and re-stated Mr. Crumpton's Coumadin dosage. According to Ms. Cordahi, Mr. Crumpton stated to her that he had been taking Coumadin for six years. Ms. Cordahi further stated in her deposition that Mr. Crumpton did not know why he was taking Coumadin or when he last took it. Even so, Ms. Cordahi later stated in her deposition that Mr. Crumpton "seemed to know his care." Depo. of Lynn Cordahi at 80, Ex. 20 (attached to Plaintiff's Exhibits II). Mr. Crumpton appeared stable and showed no signs of any deep vein thrombosis (DVT) when he saw Ms. Cordahi.

Ms. Cordahi noted on the Physician's Orders dated April 6, 2006 to "Please contact office of Dr. Drummer for med records pertaining to blood clot in leg and Coumadin use-very imp." Ex. J (attached to Defendant Logan Roots, M.D.'s Memorandum in Support of Motion for Partial Summary Judgment (Doc. No. 73), filed June 27, 2008). Ms. Cordahi also ordered an INR blood test on April 6, 2006 to assess the ability of Mr. Crumpton's blood to coagulate and

---

[4]Contrary to Dr. Roots' testimony, Ms. Cordahi claims that she spoke with Dr. Roots at some point about Mr. Crumpton and that Dr. Roots stated that Mr. Crumpton no longer needed to take Coumadin.

5

indicated in the Physician's Orders that Mr. Crumpton should come back to the clinic the next day.

The day after having seen Mr. Crumpton, Ms. Cordahi called Dr. Kay to ask her to see Mr. Crumpton because Ms. Cordahi could not verify that Mr. Crumpton had been on Coumadin. Ms. Cordahi testified that she has never prescribed Coumadin to a patient and would rather have a physician prescribe Coumadin because of the specialized nature of Coumadin management and possible complications associated with long-term use of Coumadin. Ms. Cordahi stated to Dr. Kay that Mr. Crumpton did not exhibit any physical symptoms of a DVT. Dr. Kay testified that it was appropriate for Ms. Cordahi to determine if there was a current prescription for Coumadin before deciding how to proceed. Dr. Kay advised Ms. Cordahi to contact Mr. Crumpton's primary care doctor, contact the VA, and ask Mr. Crumpton about recurrent DVTs, past pulmonary embolisms or a history of a hypercoagulable disorder. Dr. Kay noted that in Mr. Crumpton's case, his reported dosage of Coumadin was high and starting someone on such high dosage of Coumadin without knowing if it was required could cause excessive bleeding. Dr. Kay also discussed with Ms. Cordahi the risk of starting Mr. Crumpton on Coumadin in a jail environment where accidents could occur and there is a risk of bleeding. Dr. Kay never examined Mr. Crumpton and in fact did not hear anything further about Mr. Crumpton until after his death.

Mr. Crumpton's blood was drawn on April 7, 2006 and the INR results were not ready until April 10, 2006. Mr. Crumpton's INR test results were in the normal range. According to Dr. Kay, a normal reading only shows either that Mr. Crumpton was not on Coumadin or, if he was on Coumadin, that it was not enough to be therapeutic. Dr. Kay agreed that the INR blood test was appropriate to establish a baseline prior to administering Coumadin. It appears from a

date on the INR blood test results that Ms. Cordahi did not read the test results until April 26, 2006, the day after Mr. Crumpton was released from SFCADF.  Furthermore, according to Ms. Cordahi, she tried to call the VA to obtain Mr. Crumpton's medical records but the VA was unresponsive.  Ms. Cordahi testified that she finally reached Dr. Gonzales at the VA on April 26, 2006. Ms. Cordahi asserts that she also called Health Care for the Homeless to determine if a doctor from that facility had prescribed Coumadin to Mr. Crumpton.[5]

Mr. Crumpton was released from SFCADF on April 25, 2006 and went to the VA Coumadin Clinic the following day to have an INR blood test and to restart his use of Coumadin. The April 26, 2006 VA medical record does not show that Mr. Crumpton suffered from any symptoms which would indicate that he was in danger of a pulmonary embolism.  In fact, Mr. Crumpton was told to come back on May 4, 2006 for another INR blood test and to check his Coumadin dosage.

Mr. Crumpton died on April 27, 2006 of an "organized" pulmonary thromboembolism. Ex. 17 at 3 (attached to Plaintiff's Exhibits II).  The Office of Medical Investigator stated that although the etiology of the DVT leading to Mr. Crumpton's death was not evident, "the absence of anticoagulation therapy resulting in less than therapeutic coagulation studies (April 26, 2006) almost certainly contributed to its formation, embolization to the right lung and death."  *Id*. at 5.

   *2. Mrs. Crumpton's Deposition Testimony*

Mr. Crumpton and Mrs. Crumpton separated in 2003 and were divorced in February 2006.  They had been married for over 20 years.  While the Crumptons were married, Mr.

---

[5]Fax transmission verification reports in Mr. Crumpton's medical record at SFCADF simply indicate a fax transmission on April 12, 2006 and two fax transmissions on April 24, 2006.  These fax transmission verification reports fail to show the content of the faxes.

Crumpton took insulin for diabetes and medication for hypertension. Additionally, while married, both Mr. and Mrs. Crumpton took blood thinners. Mrs. Crumpton noted that Mr. Crumpton "was very accurate with his medications." Depo. of Joann Crumpton at 71, Ex. 1 (attached to Exhibits 1-6 to Responses to Motions for Summary Judgment (Doc. No. 70), filed July 25, 2008 (Plaintiff's Exhibits I)).

When Mr. Crumpton was last incarcerated at SFCADF during March and April 2006, Mrs. Crumpton visited Mr. Crumpton once a week. According to Mrs. Crumpton, Mr. Crumpton told her several times that he was not getting Coumadin, because the doctor at SFCADF said he no longer needed Coumadin. Mr. Crumpton also told Mrs. Crumpton that he felt weak and out of breath. Mrs. Crumpton observed that Mr. Crumpton did not look well. Mrs. Crumpton noted that Mr. Crumpton had stated he complained to staff at SFCADF about his health. Nonetheless, there were no sick call notices in Mr. Crumpton's medical record.[6]

*3. Deposition Testimony by Expert Witnesses*

*a. Dr. Lambert King, Plaintiff's Medical Expert Witness*

Lambert N. King, M.D., Ph.D., is Plaintiff's medical expert witness. Dr. King noted that the March 6, 2006 VA medical record did not indicate that Mr. Crumpton was lax about taking Coumadin, because the PT and INR tests showed a 3.4 (above normal) level. Additionally, Dr. King stated that it is common for INR levels to require adjustments upwards or downwards. In other words, fluctuating INR levels do not necessarily show that a patient is not compliant in taking Coumadin. Moreover, Dr. King observed that there was no evidence that Mr. Crumpton failed to keep his INR appointments.

---

[6]A sick call notice is a request to see someone in the medical unit. The sick call notices are collected daily.

Dr. King also observed that it was appropriate for Dr. Roots to order the INR, PT, and PTT tests to establish a baseline before administering Coumadin.  However, Dr. King criticized the adequacy of how Dr. Roots took Mr. Crumpton's medical and family history, Dr. Roots' failure to make any effort to secure prior medical records from SFCADF, his failure to call Mr. Crumpton's primary care physician at the VA, his decision not to prescribe Coumadin to Mr. Crumpton, and his failure to ensure that information for a follow-up exam was passed on to an appropriate medical provider before going on vacation.  Dr. King concluded that the efforts at SFCADF to verify Mr. Crumpton's Coumadin use were not diligent or effective.

Moreover, Dr. King stated that the "highly organized" blood clot or DVT that killed Mr. Crumpton probably occurred more than a day before Mr. Crumpton died.  According to Dr. King, a DVT generally starts to develop over a period of weeks or months and an occurrence of a DVT can be either symptomatic or asymptomatic.  Dr. King further testified that if a therapeutic level of Coumadin was reached, it would have taken three to six days for any reduction of clots to begin.  Dr. King testified that if Mr. Crumpton "had been started on the Coumadin or restarted on Coumadin anytime in the first two to three weeks of the stay in jail, I believe that there would have been a high probability of preventing the pulmonary embolism." Depo. of Lambert King at 150-51, Ex. 2 (attached to Plaintiff's Exhibits I).  Dr. King noted that people who have had prior pulmonary embolisms should take Coumadin on a long term basis to reduce the risk of having another pulmonary embolism.

Also, Dr. King stated that a patient taking Coumadin must be regularly monitored for dangerous side-effects, something Dr. King believed did not occur in this case.  Dr. King noted that if Coumadin is not called for, it would be medically irresponsible to start a patient on Coumadin because an unnecessarily high dosage of Coumadin could cause excessive bleeding

9

and death.  On the other hand, if a patient needs Coumadin to thin the blood, too low a dosage of Coumadin could result in a blood clot which can also be fatal.  Dr. King concluded that the decision to keep Mr. Crumpton on a long-term use of Coumadin was well-founded.  Dr. King further opined that Dr. Roots did not have ill will or malicious intent towards Mr. Crumpton.

### *b. Dr. Gary Vilke, Dr. Roots' Medical Expert Witness*

Dr. Gary Vilke, M.D., Dr. Roots' medical expert witness, testified that he believed that the decision to not start Mr. Crumpton on Coumadin was within the standard of care.  Specifically, Dr. Vilke noted that if a patient said he had a single episode of blood clots to the legs a long time ago and did not take Coumadin all the time, and there were no records from a pharmacy documenting use of Coumadin, there would be no reason for continuing lifelong Coumadin therapy.  Also, Dr. Vilke stated that "in the totality of the evaluation, if the patient did not have a reason for [taking Coumadin], didn't have a confirmation for [Coumadin], and wasn't even voicing an objection to not being on the life saving medication, it also supports the fact that he doesn't need to be on [Coumadin]."  Depo. of Gary Vilke at 83, Ex. C (attached to Defendant Logan Roots, M.D.'s Memorandum in Support of Motion for Partial Summary).  Dr. Vilke, however, also testified that "[i]f a patient is sophisticated enough to say pulmonary embolism, and they can specify doses [of Coumadin] that are appropriate and tell me how long they have been on it, and they seem to be a reliable person, I think it would be appropriate to start the patient at that time."  Depo. of Gary Vilke at 23, Ex. 27 (attached to Plaintiff's Exhibits II).  Moreover, if a patient responds to the question, "Why are you taking Coumadin?" with "I had a blood clot to my leg" or "I had a pulmonary embolism," Dr. Vilke testified that it is within the standard of care to not ask any further questions regarding the blood clot or pulmonary embolism.  Depo. of Gary Vilke at 72, Ex. C (attached to Defendant Logan Roots, M.D.'s

Memorandum in Support of Motion for Partial Summary Judgment). Like Dr. King, Dr. Vilke opined that it would be a fair standard of practice to order an INR blood test to verify Coumadin use and that starting a person on Coumadin without an appropriate indication for its use could lead to excessive bleeding.

Dr. Vilke also testified that physicians typically do not ask for old incarceration medical records because they should be merged with the new intake medical records.  Consequently, Dr. Vilke concluded that Dr. Roots was not required to specifically request the 2004 SFCADF medical records and that those records were simply not available at that time.

### 4. *Plaintiff's Claims Against Dr. Roots*

Plaintiff is suing Dr. Roots in both his individual and official capacities.  Plaintiff alleges a §1983 claim against Dr. Roots for violating the Fourteenth and Eighth Amendments, a state civil conspiracy claim, a state claim for intentional infliction of emotional distress, and a state medical negligence claim.  Dr. Roots moves for partial summary judgment only as to the §1983 Eighth Amendment claim, the state civil conspiracy claim, and the state intentional infliction of emotional distress claim. The Court has since dismissed with prejudice Plaintiff's §1983 Fourteenth Amendment claim, the state civil conspiracy claim, and the state intentional infliction of emotional distress claim.  Order Dismissing Civil Conspiracy, Intentional Infliction of Emotional Distress, and Fourteenth Amendment Claims, and Order Setting Briefing Schedule (Doc. No. 97), filed Oct. 10, 2008.  Hence, the only claim at issue in this motion for partial summary judgment is the §1983 Eighth Amendment claim which Dr. Roots argues should be dismissed against him in his individual capacity based on qualified immunity.  Dr. Roots also seeks an award of attorney's fees and costs should the Court grant summary judgment on the §1983 Eighth Amendment claim.

*B. Summary Judgment Standard*

Summary judgment motions involving a qualified immunity defense are determined somewhat differently than other summary judgment motions. *See Romero v. Fay*, 45 F.3d 1472, 1475 (10th Cir. 1995). "When a defendant raises the qualified immunity defense on summary judgment, the burden shifts to the plaintiff to meet a strict two-part test." *Nelson v. McMullen*, 207 F.3d 1202, 1206 (10th Cir. 2000). This is a heavy burden for the plaintiff. *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001)(citing *Albright v. Rodriguez*, 51 F.3d 1531, 1534 (10th Cir. 1995)). "'First, the plaintiff must demonstrate that the defendant's actions violated a constitutional or statutory right. Second, the plaintiff must show that the constitutional or statutory rights the defendant allegedly violated were clearly established at the time of the conduct at issue.'" *Nelson*, 207 F.3d at 1206 (quoting *Albright*, 51 F.3d at 1534-35). If, and only if, the plaintiff establishes both elements of the qualified immunity test does a defendant then bear the traditional burden of showing "'that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law.'" *Nelson*, 207 F.3d at 1206 (quoting *Albright*, 51 F.3d at 1535)). In other words, although the court "review[s] the evidence in the light most favorable to the nonmoving party, the record must clearly demonstrate the plaintiff has satisfied his heavy two-part burden; otherwise, the defendants are entitled to qualified immunity." *Cram*, 252 F.3d at 1128 (citation omitted).

*C. Discussion*

  *1. Eighth Amendment Claim*

Although medical malpractice is not a constitutional violation actionable under §1983, a plaintiff can state a valid claim of medical mistreatment under the Eighth Amendment by alleging "acts or omissions sufficiently harmful to evidence deliberate indifference to serious

medical needs." *Kikumura v. Osagie*, 461 F.3d 1269, 1291 (10th Cir. 2006)(internal quotation marks omitted), *abrogated on other grounds by Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007). The test for "deliberate indifference" under the Eighth Amendment consists of both objective and subjective components. *Id*.

The objective component is met if the plaintiff alleges a "sufficiently serious" medical need to implicate the Eighth Amendment. *Id*. "A medical need is sufficiently serious 'if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000)(quoting *Hunt v. Uphoff*, 199 F.3d 1220, 1224 (10th Cir. 1999)). "When the prisoner's Eighth Amendment claim is premised on an alleged delay in medical care, the prisoner must 'show that the delay resulted in substantial harm.'" *Kikumura*, 461 F.3d at 1292 (quoting *Oxendine v. Kaplan*, 241 F.3d 1272, 1276 (10th Cir. 2001)(internal quotation marks omitted)).

The subjective component of the deliberate indifference test requires that a plaintiff show that the prison official had a "'sufficiently culpable state of mind.'" *Self v. Crum*, 439 F.3d 1227, 1231 (10th Cir.), *cert. denied*, 549 U.S. 856 (2006)(quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). "[T]he subjective component presents a high evidentiary hurdle to the plaintiffs: a prison official must know about and disregard a substantial risk of serious harm." *Id*. at 1232. In other words, the plaintiff must show that the prison official had a conscious disregard of a substantial risk of harm. "[T]he subjective component is not satisfied, absent an extraordinary degree of neglect, where a doctor merely exercises his considered medical judgment. Matters that traditionally fall within the scope of medical judgment are such decisions as whether to consult a specialist or undertake additional medical testing." *Id*. "A claim is therefore

actionable only in cases where the need for additional treatment or referral to a medical specialist is obvious." *Id.* "So long as a medical professional provides a level of care consistent with the symptoms presented by the inmate, absent evidence of actual knowledge or recklessness, the requisite state of mind cannot be met. Indeed, [the] subjective inquiry is limited to consideration of the doctor's knowledge at the time he prescribed treatment for the symptoms presented, not to the ultimate treatment necessary." *Id.* at 1233.

### a. Objective Component

Dr. Roots argues that to establish the objective component, Plaintiff must show that on March 28, 2006, the only time Dr. Roots saw Mr. Crumpton, Mr. Crumpton complained to Dr. Roots about his health and was "fatigued." *See* First Amended Complaint at ¶46 ("During the time he was incarcerated in 2006 Crumpton continually looked fatigued, he continuously complained to SFCADF, the medical staff and his cell mates about his health."). Dr. Roots contends that the undisputed material evidence shows that on March 28, 2006, Mr. Crumpton did not exhibit any objective signs of a pulmonary embolism or DVT, nor did Mr. Crumpton complain to Dr. Roots about being fatigued or feeling poorly. The question of whether Mr. Crumpton showed symptoms related to the inability of his blood to coagulate in a normal fashion, however, is irrelevant to the objective component of the Eighth Amendment test. "[T]he question raised by the objective prong of the deliberate indifference test is whether the alleged harm ... is sufficiently serious ..., rather than whether the symptoms displayed to the prison employee are sufficiently serious...." *Mata v. Saiz*, 427 F.3d 745, 753 (10th Cir. 2005). Displayed symptoms are relevant to the subjective component of the Eighth Amendment test. *Id.*

In this case, it is undisputed that Mr. Crumpton had been diagnosed with a blood clotting disorder that could lead to life threatening DVTs and pulmonary embolisms, and that he had been prescribed Coumadin to prevent blood clots.  This evidence supports Plaintiff's contention that Mr. Crumpton's medical condition was objectively and sufficiently serious.  Moreover, Plaintiff, through the testimony of Dr. King and the Office of Medical Investigator's report, has provided evidence that the delay in providing Mr. Crumpton with Coumadin resulted in the DVT and pulmonary embolism that ultimately killed him.  Plaintiff has, therefore, met the objective component of the Eighth Amendment test.

### b. Subjective Component

Dr. Roots further argues that there is no evidence supporting an inference that he knew about and disregarded a substantial risk of harm to Mr. Crumpton by not starting Mr. Crumpton on Coumadin prior to establishing a baseline through the use of an INR blood test.  At the time Dr. Roots saw Mr. Crumpton on March 28, 2006, Dr. Roots knew that Mr. Crumpton had a history of blood clots to the leg and a history of Coumadin use to prevent blood clots, and Dr. Roots knew that Coumadin usually is given lifelong. Dr. Roots, however, did not know that Mr. Crumpton had been hospitalized previously for a pulmonary embolism, and Dr. Roots did not realize that Mr. Crumpton had been incarcerated previously although the Medical Intake History and Screening form generally and without specificity indicated a previous incarceration. Dr. Roots did not have the 2004 SFCADF medical records noting the prior hospitalization and Mr. Crumpton's use of Coumadin.  Moreover, Dr. Roots did not have a confirmed prescription or dosage for Coumadin, and Coumadin was not listed as a current medication on the Medical Intake History and Screening form.  Dr. Roots did not have the VA medical records.  Mr. Crumpton did not appear to be in any apparent distress. Nonetheless, Dr. Roots ordered an INR

15

blood test to establish a baseline prior to deciding whether to administer Coumadin and he expected Ms. Cordahi or Dr. Kay to provide Mr. Crumpton with further medical care while he was on vacation.

Plaintiff argues, on the other hand, that he has met the subjective component based on the following facts: Dr. Roots failed to take an adequate medical history including a family history of blood clots, prior hospitalizations for blood clots or pulmonary embolisms, and the dosage of Coumadin Mr. Crumpton had been taking prior to the 2006 incarceration; Dr. Roots failed to contact Mr. Crumpton's treating physician; Dr. Roots did not ask Mr. Crumpton why he was not asking for Coumadin; Dr. Roots failed to request Mr. Crumpton's 2004 medical records from his prior incarceration which would have shown that a previous blood clot had traveled to his lung and that Mr. Crumpton was taking Coumadin at SFCADF; and Dr. Roots failed to discuss Mr. Crumpton's need for Coumadin or the INR blood test with Dr. Kay before he left on vacation. Moreover, Plaintiff notes that there was no need to wait for the INR blood test before starting Mr. Crumpton on Coumadin because Mr. Crumpton had been deprived of Coumadin for over a week and therefore, the INR level would necessarily have been normal. In addition, Plaintiff contends that Dr. Roots was not concerned about Mr. Crumpton forming a blood clot because "some people do and some people don't" form blood clots. Depo. of Logan Roots at 35, Ex. 9 (attached to Plaintiff's Exhibits II). Plaintiff also notes that, according to Dr. King, the standard of care would have been to start Mr. Crumpton on Coumadin while waiting for his medical records. Finally, Plaintiff asserts that Dr. Roots was not credible in stating that Mr. Crumpton was lax in taking Coumadin because no such comment was in Dr. Roots' medical notes nor did the medical notes reflect that Mr. Crumpton was not caring for himself. In fact, Mr. Crumpton had been visiting the VA Coumadin clinic regularly prior to his 2006 incarceration although his

16

INR levels had varied, and Dr. Roots did not recollect Mr. Crumpton except as being slightly disheveled and looking older than his stated age.

Assuming Dr. Roots had taken a complete medical history as Plaintiff claims Dr. Roots should have done and that Dr. Roots reviewed the 2004 SFCADF medical records, Dr. Roots would have discovered that Mr. Crumpton had a prior pulmonary embolism approximately six years previously, Mr. Crumpton was diligently taking Coumadin, and Mr. Crumpton knew his Coumadin dosage amounts. Even if Dr. Roots had this information about Mr. Crumpton's medical condition and care, the undisputed evidence indicates that starting Mr. Crumpton on Coumadin without any medically verifiable information on dosage levels could be dangerous and even potentially lethal. Furthermore, if Mr. Crumpton had told Dr. Roots he was taking the dosage levels of Coumadin he had later communicated to Ms. Cordahi, according to Dr. Kay, those dosage levels were high and could cause excessive bleeding if they were not accurate. Dr. Kay indicated that she would not have started someone on that dosage without knowing whether it was required. Additionally, if Dr. Roots had verified a specific dosage through the VA or a pharmacy, the fact that Mr. Crumpton had not taken Coumadin after March 21, 2006 probably would have caused his INR level to change by the time Dr. Roots saw him on March 28, 2006.[7] A change in the INR level could require an adjustment in the Coumadin dosage. Under any of these scenarios, including the actual situation faced by Dr. Roots, it would not have been "patently unreasonable" for Dr. Roots to establish a baseline by ordering an INR blood test prior to deciding to administer Coumadin to Mr. Crumpton. *See Self*, 439 F.3d at 1232 ("If a prison doctor, for example, responds to an obvious risk with treatment that is patently unreasonable, a

---

[7]Dr. Roots had testified that the effects of Coumadin last only a day or two.

jury may infer conscious disregard.").

Although there is some disagreement as to the value of the INR test if it showed a normal reading, Dr. King, Dr. Vilke, and Dr. Kay all agreed that ordering the INR blood test was appropriate prior to administering Coumadin.  In fact, if a decision to order further medical testing does not constitute an extraordinary degree of neglect that decision falls within the scope of a medical judgment and does not implicate the Eighth Amendment.  Here, three physicians agreed that ordering an INR blood test was appropriate.  Hence, Dr. Roots' decision to order the INR blood test prior to administering Coumadin to Mr. Crumpton did not constitute an extraordinary degree of neglect, but simply an exercise of medical judgment.  Consequently, Dr. Roots' decision to not start Mr. Crumpton on Coumadin before obtaining the results of an INR blood test fails to show a conscious disregard of Mr. Crumpton's propensity to develop life threatening blood clots or DVTs.

In addition, Dr. Roots' decision to not speak with Ms. Cordahi or Dr. Kay about Mr. Crumpton before leaving on vacation does not rise to the level of a conscious disregard of Mr. Crumpton's condition.  Dr. Roots expected that Ms. Cordahi and Dr. Kay would take on his duties while he was on vacation.  In fact, that is exactly what happened.  About a week after Dr. Roots' examination of Mr. Crumpton, Ms. Cordahi re-examined Mr. Crumpton, re-ordered the INR blood test, consulted with Dr. Kay, attempted to obtain the VA records, and attempted to call Mr. Crumpton's physicians.  Dr. Roots correctly assumed that Mr. Crumpton would continue to receive medical care in his absence.  Whether that subsequent medical care was adequate is not an issue before the Court in this motion for partial summary judgment.

In sum, the Plaintiff has not provided evidence, circumstantial or otherwise, that Dr. Roots had the requisite culpable state of mind to satisfy the subjective component of the Eighth

18

Amendment test. Hence, the Plaintiff has failed to carry his heavy burden of showing that Dr. Roots violated the Eighth Amendment. Dr. Roots, therefore, is entitled to qualified immunity with respect to the Eighth Amendment claim brought against him in his individual capacity and that claim will be dismissed with prejudice. *See Beedle v. Wilson*, 422 F.3d 1059, 1069 (10th Cir. 2005)(qualified immunity is only available to a party sued in his individual capacity).

### 2. *Official Capacity*

Dr. Roots is also sued in his official capacity. The Court *sua sponte* considers whether the §1983 Eighth Amendment claim against Dr. Roots in his official capacity should be dismissed.[8] The United States Supreme Court has held that neither states nor state officers sued in their official capacities are "persons" within the meaning of §1983. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989). Consequently, the Plaintiff cannot sue Dr. Roots in his official capacity under §1983 and Plaintiff's §1983 Eighth Amendment claim against Dr. Roots in his official capacity will be dismissed with prejudice as well.

### 3. *Dr. Roots' Request for an Award of Attorney's Fees and Costs*

In his motion for partial summary judgment, Dr. Roots requests an award of attorney's fees and costs if he prevails on the motion for partial summary judgment. This request for attorney's fees and costs, however, should be presented in a fully briefed motion for attorney's fees and costs which would include appropriate affidavits and time records. D.N.M. LR-Civ. 54.5(a). Dr. Roots' request for an award of attorney's fees and costs will, therefore, be denied at

---

[8] A district court may *sua sponte* dismiss a plaintiff's claim under Fed. R. Civ. P. 12(b)(6) if "'it is "patently obvious" that the plaintiff could not prevail on the facts alleged, and allowing him an opportunity to amend his complaint would be futile.'" *Smith v. New Mexico*, 94 Fed. Appx. 780, 781 (10th Cir.), *cert. denied*, 125 S.Ct. 360 (2004)(quoting *Hall v. Bellmon*, 935 F.2d 1106, 1109 (10th Cir. 1991)).

this time as premature.

 IT IS ORDERED that:

 1.  Defendant Logan Roots, M.D.'s Motion for Partial Summary Judgment (Doc. No. 72) is granted and partial summary judgment will be entered in favor of Dr. Roots on Plaintiff's §1983 Eighth Amendment claim against Dr. Roots in his individual and official capacities; and

 2.  Dr. Roots' request for attorney's fees and costs is denied at this time.

_____
SENIOR UNITED STATES DISTRICT JUDGE