IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

DENNIS P. MURPHY, as Personal Representative
of the Estate of William D. Crumpton, deceased,

      Plaintiff,

vs.                                               Civ. No.  07-188 JP/WDS

LAURA KAY, M.D., individually and in her official capacity;
LOGAN ROOTS, M.D., individually and in his official capacity;
and THE BOARD OF COUNTY COMMISSIONERS OF
SANTA FE COUNTY,

      Defendants.

<u>MEMORANDUM OPINION AND ORDER</u>

On June 17, 2008, Defendant Laura Kay, M.D., filed a Motion for Summary Judgment as to Laura Kay, M.D. (Doc. No. 69).  Having considered the briefs[1] and the relevant law, the Court concludes that partial summary judgment should be granted in favor of Dr. Kay, in both her individual and official capacities, as to the Eighth Amendment and supervisor liability claims brought under 42 U.S.C. §1983, and that the remaining state claims in this lawsuit, including the state law claims against Dr. Kay, should be remanded to state court.[2]  In addition, the Court will deny Dr. Kay's request for attorney's fees and costs.

---

[1]The briefing included supplemental briefs on whether the New Mexico Tort Claims Act waives immunity for negligent hiring, training, and supervision claims brought against a public employee who is not a law enforcement officer.  *See* Doc. Nos. 98 and 101.

[2]This case was removed from the First Judicial District Court, County of Santa Fe, State of New Mexico.

*A. Background*

Plaintiff, the personal representative of the estate of William Crumpton, contends that Defendants are responsible for failing to give Coumadin, a blood thinner, to Mr. Crumpton while he was incarcerated at the Santa Fe County Adult Detention Facility (SFCADF) from March 21, 2006 to April 25, 2006.  Plaintiff alleges that the failure to give Coumadin to Mr. Crumpton led to his death two days after he was released from SFCADF.

*1. The Facts Leading to Mr. Crumpton's Death*

Mr. Crumpton was first incarcerated at SFCADF in 2004.  Although the staff at SFCADF had assured Joanne Crumpton, Mr. Crumpton's wife, that he would get his medications while incarcerated, the staff did not initially provide Mr. Crumpton with his medications including Coumadin. Consequently, Mrs. Crumpton wrote a letter to the *New Mexican*, a Santa Fe newspaper, about her inability to persuade the staff at SFCADF to give Mr. Crumpton his medications.  As a result of that letter, Mr. Crumpton received his medications at SFCADF.  Mr. Crumpton was later released from SFCADF apparently sometime in 2004.  Medical records from the Veterans Administration (VA) show that Mr. Crumpton had his blood tested and his Coumadin dosage adjusted multiple times from October 2004 to March 6, 2006 at the VA Coumadin Clinic.

On March 21, 2006, Mr. Crumpton was again incarcerated at SFCADF.  Upon being incarcerated, Mr. Crumpton was seen by Patrick Dan Salas, the Paramedic/Laboratory Supervisor and Medical Supply Supervisor at SFCADF, who completed a Medical Intake History and Screening form.  Mr. Salas noted on the Medical Intake History and Screening form that Mr. Crumpton did not indicate that he had a medical problem that needed immediate attention.  Mr. Salas, however, noted that Mr. Crumpton had seen a doctor in the last 6 months

2

concerning Coumadin use.  In answering a question regarding chronic illness, Mr. Salas did not indicate on the Medical Intake History and Screening form that Mr. Crumpton had a problem with blood coagulation. Although Mr. Salas listed Mr. Crumpton's medications, including exact dosages provided by Mr. Crumpton, Mr. Salas did not list Coumadin.  Mr. Salas testified that it was unique that an individual in Mr. Crumpton's position was so familiar with his medications and that if Coumadin was not listed as a medication, it was because Mr. Crumpton did not tell Mr. Salas that he was currently taking Coumadin.  The Medical Intake History and Screening form showed that Mr. Crumpton's doctors were Dr. Drummer and Dr. Gonzales at the VA, and that Mr. Crumpton used the Kiva Pharmacy. The Medical Intake History and Screening form also noted that Mr. Crumpton had been incarcerated previously but the form did not indicate a time or place for that previous incarceration.  Having completed this initial medical assessment, Mr. Salas cleared Mr. Crumpton to join the general inmate population.  Subsequent to Mr. Crumpton's examination by Mr. Salas, SFCADF confirmed Mr. Crumpton's prescriptions for all of his listed medications.  The confirmed prescriptions did not include Coumadin.

Next, Mr. Crumpton saw Dr. Logan Roots on March 28, 2006.  Dr. Roots was unaware that Mr. Crumpton had been incarcerated previously despite the indication in the Medical Intake History and Screening form of a previous incarceration.  Consequently, Dr. Roots did not request Mr. Crumpton's 2004 SFCADF medical records.

According to Dr. Roots, Mr. Crumpton stated that he had a blood clot in his leg in 1999 and had been taking Coumadin since then but that he did not know the dosage of the Coumadin. Dr. Roots, however, did not believe Mr. Crumpton regarding his Coumadin use because Mr. Crumpton stated that he had been "very lax" in 2006 about taking Coumadin, and Coumadin was not a listed medication on the Medical Intake History and Screening form.  Depo. of Logan

3

Roots at 28, Ex. 9 (attached to Exhibits 7-28 to Responses to Motion for Summary Judgment (Doc. No. 80), filed July 25, 2008 (Plaintiff's Exhibits II)).  Dr. Roots also contended that Mr. Crumpton did not ask for Coumadin and "[h]e didn't seem to care...."  *Id.* at 30.

Dr. Roots' medical notes state that except for being overweight, Mr. Crumpton was "otherwise well."  Dr. Roots also noted in the medical record that Mr. Crumpton had hypertension which was well controlled, suffered from diabetes, and was taking lithium for a bipolar condition.  Moreover, Dr. Roots noted that although Mr. Crumpton had a history of blood clots in the calves, there was "[n]o need for coumadin now."  Ex. 8 (attached to Plaintiff's Exhibits II).

In order to decide whether Mr. Crumpton should start taking Coumadin again, Dr. Roots ordered an international normalized ratio (INR) blood test to establish a baseline value for determining how well Mr. Crumpton's blood was coagulating.[3]  The desired INR therapeutic value for a patient on Coumadin is between 2 and 3.  A value between 1 and 2 is considered normal but not therapeutic.  Dr. Roots testified that if the INR results had been above 3, he would not have started Mr. Crumpton on Coumadin because of the possibility of excessive bleeding.  If the results had been normal, Dr. Roots would have waited to review Mr. Crumpton's VA medical records, and Dr. Kay, the medical director at SFCADF, would have had to decide whether to start Mr. Crumpton on Coumadin.  Dr. Roots testified that Coumadin is usually prescribed on a lifetime basis and that a dose of Coumadin is effective for only a day or two.

---

[3]Other blood tests ordered with the INR test were prothrombin time (PT) and partial thromboplastin time (PTT) tests.

In fact, the INR test Dr. Roots ordered was never done and Dr. Roots never personally contacted Mr. Crumpton's doctors nor did he request any VA medical records.[4] The day after Dr. Roots saw Mr. Crumpton, Dr. Roots went on vacation.  Both Lynn Cordahi, a nurse practitioner, and Dr. Kay would have been expected to take on Dr. Roots' duties while he was on vacation. Dr. Roots claims that he did not discuss Mr. Crumpton's case with Ms. Cordahi before he left on vacation.[5]

On April 6, 2006, Ms. Cordahi saw Mr. Crumpton.  Ms. Cordahi noted on an Admission Data form that Mr. Crumpton had a blood clot six years previously and that his current medications included Coumadin.  She also noted on a Medical History and Physical Assessment form the precise dosage of Coumadin which Mr. Crumpton said he had been taking.  Ms. Cordahi, moreover, completed a Problem List form which indicated a leg clot going to the lungs in 1999 and re-stated Mr. Crumpton's Coumadin dosage.  According to Ms. Cordahi, Mr. Crumpton told her that he had been taking Coumadin for six years. Ms. Cordahi testified in her deposition that Mr. Crumpton did not know why he was taking Coumadin or when he last took it.  Even so, Ms. Cordahi later stated in her deposition that Mr. Crumpton "seemed to know his care."  Depo. of Lynn Cordahi at 80, Ex. 20 (attached to Plaintiff's Exhibits II).  Mr. Crumpton appeared stable and showed no signs of any deep vein thrombosis (DVT) when he saw Ms. Cordahi.

---

[4]Dr. Roots testified that nurses request the medical records by fax.

[5]Contrary to Dr. Roots' testimony, Ms. Cordahi claims that she spoke with Dr. Roots at some point about Mr. Crumpton and that Dr. Roots stated that Mr. Crumpton no longer needed to take Coumadin.

Ms. Cordahi noted on the Physician's Orders dated April 6, 2006 to "Please contact office of Dr. Drummer for med records pertaining to blood clot in leg and Coumadin use-very imp."  Ex. V (attached to Defendant Laura Kay, M.D.'s Reply Brief in Support of Her Motion for Summary Judgment (Doc. No. 91), filed Aug. 21, 2008). Ms. Cordahi also ordered an INR blood test on April 6, 2006 to assess the ability of Mr. Crumpton's blood to coagulate and indicated in the Physician's Orders that Mr. Crumpton should come back to the clinic the next day.

The day after having seen Mr. Crumpton, Ms. Cordahi called Dr. Kay to ask her to see Mr. Crumpton because Ms. Cordahi could not verify Mr. Crumpton's use of  Coumadin.[6] Ms. Cordahi testified that she has never prescribed Coumadin for a patient and would rather have a physician prescribe Coumadin because of the specialized nature of Coumadin management and possible complications associated with long-term use of Coumadin.  Ms. Cordahi stated to Dr. Kay that Mr. Crumpton did not exhibit any physical symptoms of a DVT.  Dr. Kay testified that it was appropriate for Ms. Cordahi to determine if there was a current prescription for Coumadin before deciding how to proceed.  Dr. Kay advised Ms. Cordahi to contact Mr. Crumpton's primary care doctor, contact the VA, and ask Mr. Crumpton about recurrent DVTs, past pulmonary embolisms or a history of a hypercoagulable disorder.  Dr. Kay noted that in Mr. Crumpton's case, his reported dosage of Coumadin was high and starting someone on such high dosage of Coumadin without knowing if it was required could cause excessive bleeding. Dr. Kay also discussed with Ms. Cordahi the risk of starting Mr. Crumpton on Coumadin in a jail environment where accidents could occur and there is a risk of bleeding. Dr. Kay never

_____

[6]Dr. Kay did not recall that Ms. Cordahi asked her to actually see Mr. Crumpton.

examined Mr. Crumpton and in fact did not hear anything further about Mr. Crumpton until after his death.

Mr. Crumpton's blood was drawn on April 7, 2006 and the INR results were not ready until April 10, 2006.  Mr. Crumpton's INR test results were in the normal range.  According to Dr. Kay, a normal reading only shows either that Mr. Crumpton was not on Coumadin or, if he was on Coumadin, that it was not enough to be therapeutic.  Dr. Kay agreed that the INR blood test was appropriate to establish a baseline prior to administering Coumadin.  It appears from a date on the INR blood test results that Ms. Cordahi did not read the test results until April 26, 2006, the day after Mr. Crumpton was released from SFCADF.  Furthermore, according to Ms. Cordahi, she tried to call the VA to obtain Mr. Crumpton's medical records but the VA was unresponsive.  Ms. Cordahi testified that she finally reached Dr. Gonzales at the VA on April 26, 2006. Ms. Cordahi asserts that she also called Health Care for the Homeless to determine if a doctor from that facility had prescribed Coumadin for Mr. Crumpton.[7]

Mr. Crumpton was released from SFCADF on April 25, 2006 and went to the VA Coumadin Clinic the following day to have an INR blood test and to restart his use of Coumadin. The April 26, 2006 VA medical record does not show that Mr. Crumpton suffered from any symptoms which would indicate that he was in danger of a pulmonary embolism.  In fact, Mr. Crumpton was told to come back on May 4, 2006 for another INR blood test and to check his Coumadin dosage.

---

[7]Fax transmission verification reports in Mr. Crumpton's medical record at SFCADF simply indicate a fax transmission on April 12, 2006 and two fax transmissions on April 24, 2006.  These fax transmission verification reports, however, fail to show the content of the faxes.

Mr. Crumpton died on April 27, 2006 of an "organized" pulmonary thromboembolism. Ex. 17 at 3 (attached to Plaintiff's Exhibits II). The Office of Medical Investigator stated that although the etiology of the DVT leading to Mr. Crumpton's death was not evident, "the absence of anticoagulation therapy resulting in less than therapeutic coagulation studies (April 26, 2006) almost certainly contributed to its formation, embolization to the right lung and death." *Id.* at 5.

2. *Mrs. Crumpton's Deposition Testimony*

Mr. Crumpton and Mrs. Crumpton separated in 2005 and were divorced in February 2006. They had been married for over 20 years. While the Crumptons were married, Mr. Crumpton took insulin for diabetes and medication for hypertension. Additionally, while married, both Mr. and Mrs. Crumpton took blood thinners. Mrs. Crumpton noted that Mr. Crumpton "was very accurate with his medications." Depo. of Joann Crumpton at 71, Ex. 1 (attached to Exhibits 1-6 to Responses to Motions for Summary Judgment (Doc. No. 70), filed July 25, 2008 (Plaintiff's Exhibits I)).

When Mr. Crumpton was last incarcerated at SFCADF during March and April 2006, Mrs. Crumpton visited Mr. Crumpton once a week. According to Mrs. Crumpton, Mr. Crumpton told her several times that he was not getting Coumadin, because the doctor at SFCADF said he no longer needed Coumadin. Mr. Crumpton also told Mrs. Crumpton that he felt weak and out of breath. Mrs. Crumpton observed that Mr. Crumpton did not look well. Mrs. Crumpton noted that Mr. Crumpton had stated he complained to staff at SFCADF about his health. Nonetheless, there were no sick call notices in Mr. Crumpton's medical record.[8] Moreover, to Dr. Kay's knowledge, no family member or anyone else called SFCADF to

_____

[8]A sick call notice is a request to see someone in the medical unit. The sick call notices are collected daily.

complain about Mr. Crumpton's lack of Coumadin.

### 3. Deposition Testimony by Expert Witnesses

#### a. Dr. Lambert King, Plaintiff's Expert Witness

Lambert N. King, M.D., Ph.D., is Plaintiff's expert witness.  Dr. King testified that Dr. Kay gave reasonable medical advice to Ms. Cordahi to verify Mr. Crumpton's use of Coumadin with his medical care providers. Dr. King, however, was critical of the fact that Dr. Kay did not follow up on her recommendation to Ms. Cordahi to call Mr. Crumpton's primary care practitioner about Mr. Crumpton's use of Coumadin.  Dr. King also believed that Dr. Kay should have instructed Ms. Cordahi to restart Mr. Crumpton on Coumadin pending the receipt of information from Mr. Crumpton's primary care practitioner because Mr. Crumpton proved to be a reliable historian.

Dr. King noted that the March 6, 2006 VA medical record did not indicate that Mr. Crumpton was lax about taking Coumadin, because the PT and INR tests showed a 3.4 (above normal) level.   Additionally, Dr. King stated that it is common for INR levels to require adjustments upwards or downwards. In other words, fluctuating INR levels do not necessarily show that a patient is not compliant in taking Coumadin. Moreover, Dr. King observed that there was no evidence that Mr. Crumpton failed to keep his INR appointments but it appeared from the VA documentation of Mr. Crumpton's INR levels that it was likely he had missed some Coumadin dosages in March 2006.

Dr. King also observed that it was appropriate for Dr. Roots to order the INR, PT, and PTT tests to establish a baseline before administering Coumadin.  However, Dr. King criticized the adequacy of how Dr. Roots took Mr. Crumpton's medical and family history, Dr. Roots' failure to make any effort to secure prior medical records from SFCADF, his failure to call Mr.

Crumpton's primary care physician at the VA, his decision not to prescribe Coumadin to Mr. Crumpton, and his failure to ensure that information for a follow-up exam was passed on to an appropriate medical provider before going on vacation.  Dr. King concluded that the efforts at SFCADF to verify Mr. Crumpton's Coumadin use were not diligent or effective.

Moreover, Dr. King stated that the "highly organized" blood clot or DVT that killed Mr. Crumpton probably occurred more than a day before Mr. Crumpton died.  According to Dr. King, a DVT generally starts to develop over a period of weeks or months and an occurrence of a DVT can be either symptomatic or asymptomatic.  Dr. King further testified that if a therapeutic level of Coumadin was reached, it would have taken three to six days for any reduction of clots to begin.  Dr. King testified that if Mr. Crumpton "had been started on the Coumadin or restarted on Coumadin anytime in the first two to three weeks of the stay in jail, I believe that there would have been a high probability of preventing the pulmonary embolism." Depo. of Lambert King at 150-51, Ex. 2 (attached to Plaintiff's Exhibits I).  Dr. King noted that people who have had prior pulmonary embolisms should take Coumadin on a long term basis to reduce the risk of having another pulmonary embolism.

Also, Dr. King stated that a patient taking Coumadin must be regularly monitored for dangerous side-effects, something Dr. King believed did not occur in this case.  Dr. King noted that if Coumadin is not called for, it would be medically irresponsible to start a patient on Coumadin because an unnecessarily high dosage of Coumadin could cause excessive bleeding and death.  On the other hand, if a patient needs Coumadin to thin the blood, too low a dosage of Coumadin could result in a blood clot which can also be fatal.  Dr. King concluded that the decision to keep Mr. Crumpton on a long-term use of Coumadin was well-founded.

### b. *Dr. Gary Vilke, Dr. Kay's Expert Witness*

Dr. Gary Vilke, M.D., Dr. Kay's medical expert witness, testified that he believed that the decision to not start Mr. Crumpton on Coumadin was within the standard of care. Specifically, Dr. Vilke noted that if a patient said he had a single episode of blood clots to the legs a long time ago and did not take Coumadin all the time, and there were no records from a pharmacy documenting use of Coumadin, there would be no reason for continuing lifelong Coumadin therapy. Also, Dr. Vilke stated that "in the totality of the evaluation, if the patient did not have a reason for [taking Coumadin], didn't have a confirmation for [Coumadin], and wasn't even voicing an objection to not being on the life saving medication, it also supports the fact that he doesn't need to be on [Coumadin]." Depo. of Gary Vilke at 83, Ex. Q (attached to Defendant Laura Kay, M.D.'s Reply Brief in Support of Her Motion for Summary Judgment). Dr. Vilke, however, also testified that "[i]f a patient is sophisticated enough to say pulmonary embolism, and they can specify doses [of Coumadin] that are appropriate and tell me how long they have been on it, and they seem to be a reliable person, I think it would be appropriate to start the patient at that time." Depo. of Gary Vilke at 23, Ex. 27 (attached to Plaintiff's Exhibits II). Moreover, Dr. Vilke testified that if a patient responds to the question, "Why are you taking Coumadin?" with "I had a blood clot to my leg" or "I had a pulmonary embolism," it is within the standard of care to not ask any further questions regarding the blood clot or pulmonary embolism. Depo. of Gary Vilke at 72, Ex. C (attached to Defendant Logan Roots, M.D.'s Memorandum in Support of Motion for Partial Summary Judgment (Doc. No. 73), filed June 27, 2008). Like Dr. King, Dr. Vilke opined that it would be a fair standard of practice to order an INR blood test to verify Coumadin use and that starting a person on Coumadin without an appropriate indication for its use could lead to excessive bleeding.

In addition, Dr. Vilke testified that INR levels can fluctuate due to many reasons such as noncompliance with Coumadin and the taking of certain medications.  Looking at Mr. Crumpton's INR levels as documented by the VA prior to his 2006 incarceration, Dr. Vilke opined that he was "very suspicious that [Mr. Crumpton] was not consistent with taking his medications."  Depo. of Gary Vilke at 31, Ex. Q (attached to Defendant Laura Kay, M.D's Reply Brief in Support of Her Motion for Summary Judgment).

Dr. Vilke further stated that Dr. Kay's advice to Ms. Cordahi was within the medical standard of care.  Dr. Vilke concluded that it was within the medical standard of care for Dr. Kay to have assumed that Ms. Cordahi carried out her instructions.

### 4.  Deposition Testimony of Annabelle Romero

Annabelle Romero began work at SFCADF in May 2006 as a Corrections Oversight Administrator.  In October 2006, Ms. Romero became the Corrections Director at SFCADF and took over responsibility for compliance with the United States Department of Justice's Memorandum of Agreement (MOA) entered into with the County of Santa Fe.  One the areas of concern under the MOA was the operation of the medical unit at SFCADF.  Soon after Ms. Romero became the Corrections Director she dismissed Dr. Kay as the Medical Director because she felt that the medical unit was not a "cohesive team" due to Dr. Kay's management style which created "a continuous uproar at the facility."  Depo. of Annabelle Romero at 14, 16, Ex. 6 (attached to Plaintiff's Exhibits I).  Ms. Romero also was concerned about Dr. Roots' inadequate charting and "lackluster" job performance.  *Id*. at 25.  The Department of Justice had previously voiced its own concerns to Ms. Romero about Dr. Roots' care of inmates and indicated to Ms. Romero that she "needed to make a change."  *Id*. at 26-27.

12

     *5.  Deposition Testimony of Dr. Robert Greifinger*

     On September 29, 2006, Robert Greifinger, M.D. submitted to the United States

Department of Justice a report on whether the SFCADF was meeting the elements of the MOA

regarding the medical care of inmates.  Although Dr. Greifinger stated that he "continue[d] to be

encouraged by the quality and integrity of the medical director and health services

administrator,"[9] he still had concerns about the "serious problems with continuity of care...."  Ex.

L at 1 (attached to Memorandum in Support of Defendant Laura Kay, M.D.'s Motion for

Summary Judgment).  Dr. Greifinger noted that "[t]he medical director, however, has not had the

time to work on protocols, polices and procedures.  Nor has the medical director had the time to

supervise the primary care, perform chart review and participate in quality management and

infection control activities."  *Id*. at 3.  Dr. Greifinger also noted that "[s]taff is attempting to get

medication records but is not getting medical records (on patients with chronic disease) from

community providers."  *Id*. at 5.  In an apparent reference to Mr. Crumpton or at the very least to

an inmate in a similar situation as Mr. Crumpton, Dr. Greifinger made the following assessment:

> ... SFJ has improved its efforts to document medications ordered in the
> community.  The rule of not prescribing medication until it is documented has its
> downside.  One patient was booked with a credible history of being on blood
> thinners.  The staff sent faxes for medication records, but did not followup with a
> telephone call.  Medical records were not sought.  As a result, the patient was not
> put on the blood thinner.  He died soon after release.  Had he been put on the
> medication pending receiving medical records, he may not have died.

*Id*. at 6 (footnote omitted).  Dr. Greifinger concluded his report by stating that "[a]lthough there

has been significant improvement in the medical area, performance on the majority of the

_____

     [9]Ms. Cordahi believed that "Dr. Kay was a very excellent Medical Director...."  Depo. of
Lynn Cordahi at 30, Ex. N (attached to Defendant Laura Kay, M.D.'s Reply Brief in Support of
her Motion for Summary Judgment).

elements of the Agreement is not compliant." *Id*. at 13.

### 6. *Plaintiff's Claims Against Dr. Kay*

Plaintiff makes the following claims against Dr. Kay in her individual and official capacities: violation of the Eighth and Fourteenth Amendments under §1983, supervisory liability under §1983, common law supervisory liability, civil conspiracy, common law medical negligence, and intentional infliction of emotional distress. The Court has already dismissed with prejudice Plaintiff's §1983 Fourteenth Amendment claims, the civil conspiracy claims, and the intentional infliction of emotional distress claims. Order Dismissing Civil Conspiracy, Intentional Infliction of Emotional Distress, and Fourteenth Amendment Claims, and Order Setting Briefing Schedule (Doc. No. 97), filed Oct. 10, 2008. Hence, the claims at issue in Dr. Kay's motion for summary judgment are the §1983 Eighth Amendment claim, the §1983 supervisory liability claim, the common law supervisory liability claim, and the common law medical negligence claim.[10]

Dr. Kay argues in this motion for summary judgment that she is entitled to qualified immunity with respect to the §1983 Eighth Amendment claim made against her in her individual capacity. She also argues that she cannot be held liable for the supervisory liability claim brought against her under §1983. Finally, Dr. Kay argues that Plaintiff's state tort claims against her for common law supervisory liability and medical malpractice cannot survive summary judgment. Dr. Kay also seeks an award of attorney's fees and costs should the Court grant her motion for summary judgment.

---

[10]The other remaining claims in this case include a state medical malpractice claim against Dr. Roots, and several state claims against the Board of County Commissioners of Santa Fe County (negligent failure to protect, medical negligence, supervisory liability, and *respondeat superior*).

*B.  Standard of Review*

Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). When applying this standard, the Court examines the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment. *Applied Genetics Intl, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1990). The moving party bears the initial burden of showing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Only then does the burden shift to the non-movant to come forward with evidence showing that there is a genuine issue of material fact. *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991).  An issue of material fact is genuine if a reasonable jury could return a verdict for the non-movant. *Kaul v. Stephan*, 83 F.3d 1208, 1212 (10th Cir.1996) (citation omitted). The non-moving party may not avoid summary judgment by resting upon the mere allegations or denials of his or her pleadings. *Bacchus Indus., Inc.*, 939 F.2d at 891.

Summary judgment motions involving a qualified immunity defense are determined somewhat differently than other summary judgment motions.  *See Romero v. Fay*, 45 F.3d 1472, 1475 (10th Cir. 1995). "When a defendant raises the qualified immunity defense on summary judgment, the burden shifts to the plaintiff to meet a strict two-part test." *Nelson v. McMullen*, 207 F.3d 1202, 1206 (10th Cir. 2000). This is a heavy burden for the plaintiff. *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001)(citing *Albright v. Rodriguez*, 51 F.3d 1531, 1534 (10th Cir. 1995)). "'First, the plaintiff must demonstrate that the defendant's actions violated a constitutional or statutory right. Second, the plaintiff must show that the constitutional or statutory rights the defendant allegedly violated were clearly established at the time of the

15

conduct at issue.'" *Nelson*, 207 F.3d at 1206 (quoting *Albright*, 51 F.3d at 1534-35). If, and only

if, the plaintiff establishes both elements of the qualified immunity test does a defendant then

bear the traditional burden of showing "'that there are no genuine issues of material fact and that

he or she is entitled to judgment as a matter of law.'" *Nelson*, 207 F.3d at 1206 (quoting

*Albright*, 51 F.3d at 1535)). In other words, although the court "review[s] the evidence in the

light most favorable to the nonmoving party, the record must clearly demonstrate the plaintiff

has satisfied his heavy two-part burden; otherwise, the defendants are entitled to qualified

immunity." *Cram*, 252 F.3d at 1128 (citation omitted).

*C.  Discussion*

    *1. The §1983 Claims against Dr. Kay in her Official Capacity*

    Plaintiff brings his §1983 claims against Dr. Kay in both her individual and official

capacities.  As a preliminary matter, the Court *sua sponte* considers whether the §1983 claims

against Dr. Kay in her official capacity should be dismissed with prejudice.[11]   The United States

Supreme Court has held that neither states nor state officers sued in their official capacities are

"persons" within the meaning of §1983. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71

(1989).  Consequently, the Plaintiff cannot sue Dr. Kay in her official capacity under §1983 and

Plaintiff's §1983 claims against Dr. Kay in her official capacity will be dismissed with prejudice.

---

    [11]A district court may *sua sponte* dismiss a plaintiff's claim under Fed. R. Civ. P.
12(b)(6) if "'it is "patently obvious" that the plaintiff could not prevail on the facts alleged, and
allowing him an opportunity to amend his complaint would be futile.'"  *Smith v. New Mexico*, 94
Fed. Appx. 780, 781 (10th Cir.), *cert. denied*, 125 S.Ct. 360 (2004)(quoting *Hall v. Bellmon*, 935
F.2d 1106, 1109 (10th Cir. 1991)).

*2. The §1983 Eighth Amendment Claim Against Dr. Kay in Her Individual Capacity*

Dr. Kay argues first that she is entitled to qualified immunity as to the §1983 Eighth Amendment claim brought against her in her individual capacity. Although medical malpractice is not a constitutional violation actionable under §1983, a plaintiff can state a valid claim of medical mistreatment under the Eighth Amendment by alleging "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Kikumura v. Osagie*, 461 F.3d 1269, 1291 (10th Cir. 2006)(internal quotation marks omitted), *abrogated on other grounds by Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007). The test for "deliberate indifference" under the Eighth Amendment consists of both objective and subjective components. *Id*.

The objective component is met if the plaintiff alleges a "sufficiently serious" medical need to implicate the Eighth Amendment. *Id*. "A medical need is sufficiently serious 'if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000)(quoting *Hunt v. Uphoff*, 199 F.3d 1220, 1224 (10th Cir. 1999)). "When the prisoner's Eighth Amendment claim is premised on an alleged delay in medical care, the prisoner must 'show that the delay resulted in substantial harm.'" *Kikumura*, 461 F.3d at 1292 (quoting *Oxendine v. Kaplan*, 241 F.3d 1272, 1276 (10th Cir. 2001)(internal quotation marks omitted)).

The subjective component of the deliberate indifference test requires that a plaintiff show that the prison official had a "'sufficiently culpable state of mind.'" *Self v. Crum*, 439 F.3d 1227, 1231 (10th Cir.), *cert. denied*, 549 U.S. 856 (2006)(quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). "[T]he subjective component presents a high evidentiary hurdle to the plaintiffs: a prison official must know about and disregard a substantial risk of serious harm." *Id*. at 1232.

17

In other words, the plaintiff must show that the prison official had a conscious disregard of a substantial risk of harm. "[T]he subjective component is not satisfied, absent an extraordinary degree of neglect, where a doctor merely exercises his considered medical judgment. Matters that traditionally fall within the scope of medical judgment are such decisions as whether to consult a specialist or undertake additional medical testing." *Id.* "A claim is therefore actionable only in cases where the need for additional treatment or referral to a medical specialist is obvious." *Id.* "So long as a medical professional provides a level of care consistent with the symptoms presented by the inmate, absent evidence of actual knowledge or recklessness, the requisite state of mind cannot be met. Indeed, [the] subjective inquiry is limited to consideration of the doctor's knowledge at the time he prescribed treatment for the symptoms presented, not to the ultimate treatment necessary." *Id.* at 1233.

> a. *Objective Component*

The Court has already determined in deciding Defendant Logan Roots, M.D.'s Motion for Partial Summary Judgment (Doc. No. 72) that the Plaintiff has met the objective component of the Eighth Amendment test. As the Court stated:

> In this case, it is undisputed that Mr. Crumpton had been diagnosed with a blood clotting disorder that could lead to life threatening DVTs and pulmonary embolisms, and that he had been prescribed Coumadin to prevent blood clots. This evidence supports Plaintiff's contention that Mr. Crumpton's medical condition was objectively and sufficiently serious. Moreover, Plaintiff, through the testimony of Dr. King and the Office of Medical Investigator's report, has provided evidence that the delay in providing Mr. Crumpton with Coumadin resulted in the DVT and pulmonary embolism that ultimately killed him. Plaintiff has, therefore, met the objective component of the Eighth Amendment test.

Memorandum Opinion and Order (Doc. No. 104) at 15, filed Dec. 17, 2008. The Court will, therefore, proceed to address the subjective component of the Eighth Amendment test.

18

### b. *Subjective Component*

Plaintiff contends that the subjective component of the Eighth Amendment test is met because although Dr. Kay had all of the information Ms. Cordahi had on Mr. Crumpton, Dr. Kay still refused to see Mr. Crumpton or to administer Coumadin to Mr. Crumpton.  Plaintiff further argues that "[t]he only thing Dr. Kay did was advise Nurse Cordahi to gather more information even though she knew that Nurse Cordahi was not comfortable with prescribing Coumadin." Plaintiff's Response to Defendant Laura Kay, M.D.'s Motion for Summary Judgment (Doc. No. 76) at 17, filed July 25, 2008.

The record is not entirely clear as to whether Ms. Cordahi specifically asked Dr. Kay to see Mr. Crumpton.  Although Ms. Cordahi testified in her deposition at one point that she asked Dr. Kay to see Mr. Crumpton, Ms. Cordahi also testified that she did not specifically recall asking Dr. Kay to see Mr. Crumpton but she may have.  Depo. of Lynn Cordahi at 88, 102, Ex. 20 (attached to Plaintiff's Exhibits II) and Ex. N (attached to Defendant Laura Kay, M.D.'s Reply Brief in Support of Her Motion for Summary Judgment).  Dr. Kay does not state anywhere in the evidence that Ms. Cordahi asked her to see Mr. Crumpton.  Assuming that Ms. Cordahi did ask Dr. Kay to see Mr. Crumpton, I note that Plaintiff nevertheless failed to provide any evidence showing that an examination by Dr. Kay would have made any difference in Mr. Crumpton's subsequent medical treatment or in subsequent attempts to obtain Mr. Crumpton's medical records prior to deciding whether to administer Coumadin.

In addition, according to Dr. Kay, the Coumadin dosage level Mr. Crumpton communicated to Ms. Cordahi was high and could have caused excessive bleeding if it was not accurate.  Dr. Kay noted that she would not have started someone on that high dosage without knowing whether it was required.  In fact, the undisputed evidence indicates that starting Mr.

Crumpton on Coumadin without any medically verifiable information on a dosage level could have been dangerous and even deadly. Consequently, it would not have been "patently unreasonable" for Dr. Kay to ask Ms. Cordahi to obtain Mr. Crumpton's medical records before deciding whether to administer such a potentially dangerous drug like Coumadin to Mr. Crumpton.  *See Self v. Crum*, 439 F.3d 1227, 1232 (10th Cir.), *cert. denied*, 549 U.S. 856 (2006)("If a prison doctor, for example, responds to an obvious risk with treatment that is patently unreasonable, a jury may infer conscious disregard.").  This determination is further supported by both Dr. King and Dr. Vilke who agreed that Dr. Kay's advice to Ms. Cordahi was medically reasonable.

Moreover, Ms. Cordahi indicated that she was uncomfortable administering Coumadin and there is no evidence that she would have made the final decision as to whether to administer Coumadin and at what dosage.  There is no reason to believe that, once Ms. Cordahi had collected the necessary information, Ms. Cordahi would not have again consulted with Dr. Kay or even consulted with Dr. Roots to determine if Coumadin should have been administered to Mr. Crumpton and what the correct dosage should have been.

In sum, Dr. Kay's actions fail to show a conscious disregard of Mr. Crumpton's serious medical condition.  Plaintiff, therefore, has not provided evidence that Dr. Kay had the requisite culpable state of mind to meet the subjective component of the Eighth Amendment test and has, thus, failed to carry his heavy burden of showing that Dr. Kay violated the Eighth Amendment. Having failed to establish a constitutional violation by Dr. Kay, the Court concludes that Dr. Kay is entitled to qualified immunity with respect to the Eighth Amendment claim brought against

her in her individual capacity and that claim will be dismissed with prejudice.[12]  *See Beedle v. Wilson*, 422 F.3d 1059, 1069 (10th Cir. 2005)(qualified immunity is only available to a party sued in his individual capacity).

    *3.  The §1983 Supervisory Liability Claim Against Dr. Kay in Her Individual Capacity*

    Next, Dr. Kay argues that she is not liable for supervisory liability under §1983.  For a supervisor to be liable under §1983, there must be an underlying constitutional violation.  In this case, the only person Plaintiff contends Dr. Kay supervised who allegedly violated the constitution was Dr. Roots.[13]  Plaintiff had alleged that Dr. Roots violated both the Eighth and Fourteenth Amendments.  Those claims have been dismissed.  Partial Summary Judgment in Favor of Defendant Logan Roots, M.D. on Plaintiff's 42 U.S.C. §1983 Eighth Amendment Claim (Doc. No. 105), filed Dec. 17, 2008; Order Dismissing Civil Conspiracy, Intentional Infliction of Emotional Distress, and Fourteenth Amendment Claims, and Order Setting Briefing Schedule (Doc. No. 97), filed Oct. 10, 2008.  Without an underlying constitutional violation by Dr. Roots, Plaintiff cannot bring a §1983 supervisory liability claim against Dr. Kay in her individual capacity.  Dr. Kay is entitled to summary judgment on that claim as well.

    *4.  Plaintiff's Common Law Claims Against Dr. Kay*

    Having already dismissed the federal claims against the other Defendants and having decided to grant summary judgment as to the federal claims brought against Dr. Kay, the Court no longer has federal question jurisdiction in this case but is does have supplemental jurisdiction

---

[12]In discussing qualified immunity, Dr. Kay also argued that she did not violate any clearly established law.  The Court need not address that argument in light of its finding that the Plaintiff failed to provide evidence that Dr. Kay violated the Eighth Amendment.

[13]Plaintiff never sued Ms. Cordahi or Mr. Salas, and therefore never alleged that they violated any of Mr. Crumpton's constitutional rights.

over the remaining state law claims against Dr. Kay, Dr. Roots, and the Board of County

Commissioners of Santa Fe County.  *See* 28 U.S.C. §1367(a)(federal district courts "have

supplemental jurisdiction over all other claims that are so related to claims in the action within

such original jurisdiction that they form part of the same case or controversy under Article III of

the United States Constitution.").  The decision to exercise supplemental jurisdiction is within

the Court's discretion.  *See Carnegie-Mellon University v. Cohill*, 484 U.S. 343, 351 (1988);

*Archuleta v. Lacuesta*, 131 F.3d 1359, 1368 n. 4 (10th Cir. 1997).  Since there are no remaining

federal claims, the Court declines to continue to exercise supplemental jurisdiction under 28

U.S.C. §1367(c)(3)(federal "district courts may decline to exercise supplemental jurisdiction

over a claim ... if ... the district court has dismissed all claims over which it has original

jurisdiction....") and refrains from determining whether summary judgment should be entered

with respect to the state law claims against Dr. Kay.  The Court believes that the state court is in

a better position to interpret and apply the appropriate state law to resolve the state law claims.

The Court, therefore, will remand all remaining claims, all of which sound in state law, to state

court.  *See Carnegie-Mellon University*, 484 U.S. at 350 n.7, 357 (recognizing that, when

"federal-law claims are eliminated before trial, the balance of factors to be considered under the

pendent [or supplemental] jurisdiction doctrine-judicial economy, convenience, fairness, and

comity-will point toward declining to exercise jurisdiction over the remaining state-law claims"

and concluding that "a district court has discretion to remand to state court a removed case

involving pendent claims upon a proper determination that retaining jurisdiction over the case

would be inappropriate.").

*5. Dr. Kay's Request for an Award of Attorney's Fees and Costs*

In her motion for summary judgment, Dr. Kay requests an award of attorney's fees and costs if she prevails on the motion for summary judgment.  Dr. Kay has only prevailed partially on her motion for summary judgment. Moreover, Dr. Kay has not presented her request for attorney's fees and costs in a fully briefed motion which would include appropriate affidavits and time records.  *See* D.N.M. LR-Civ 54.5(a). Hence, Dr. Kay's request for an award of attorney's fees and costs will be denied.

IT IS ORDERED that:

1.  Dr. Kay's Motion for Summary Judgment as to Laura Kay, M.D. (Doc. No. 69) is granted in part;

2.  partial summary judgment will be entered in favor of Dr. Kay, in her individual and official capacities, on Plaintiff's §1983 Eighth Amendment and §1983 supervisory claims;

3.  all of Plaintiff's remaining claims will be remanded to state court; and

4.  Dr. Kay's request for attorney's fees and costs is denied.


_____
SENIOR UNITED STATES DISTRICT JUDGE

23